UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROLINE N. WILLIAMS, | : |
| | : |
| Plaintiff, | : **ORDER AND OPINION** |
| | : |
| - against - | : **13-CV-5431 (RLE)** |
| | : |
| CAROLYN W. COLVIN, | : |
| **Acting Commissioner of Social Security,** | : |
| | : |
| Defendant. | : |

**RONALD L. ELLIS, UNITED STATES MAGISTRATE JUDGE:**

## I. INTRODUCTION

Plaintiff Caroline N. Williams ("Williams") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income and disability insurance benefits. The parties have consented to this matter being decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The Commissioner and Williams have moved separately for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c). For the reasons stated below, the Court **GRANTS** Williams's motion and **REMANDS** this case for further proceedings.

## II. BACKGROUND

### A. Administrative Proceedings

Williams applied for supplemental security income ("SSI") and disability insurance benefits ("DIB") on July 7, 2010, alleging that she became disabled on August 10, 2009. (Administrative Record ("R.") at 20.) Williams was most recently employed as a security guard

at Madison Security Group and had previously worked both as a counselor for disabled children and as an inventory clerk.  (R. at 98.)

Following a hearing before an Administrative Law Judge ("ALJ"), Williams's application was denied on April 26, 2012.  (R. at 20.)  The ALJ found that Williams was not disabled within the meaning of the Social Security Act from August 10, 2009, through the date of the ALJ's decision.  (*Id.*)  Williams appealed the ALJ's ruling.  On June 7, 2013, the Appeals Council denied Williams's application for review.  (R. at 1-4.)  The Appeals Council found no reason under the rules to review the ALJ's decision, finding that her arguments did not provide a basis for changing the ALJ's decision.  (*Id.*)  The ALJ's decision thus constitutes the final decision of the Commissioner.

**B.  Procedural History**

On August 2, 2013, Williams filed the instant action seeking review of the ALJ's decision.  (Doc. No. 2.)  She moved for judgment on the pleadings on March 20, 2014.  (Doc. No. 13.)  Williams argues that the ALJ's decision is legally erroneous and unsupported by substantial evidence.  (*Id.*)  On June 19, 2014, the Commissioner responded with a cross-motion for judgment on the pleadings.  (Doc. No. 21.)  The Commissioner argues that substantial evidence supports the ALJ's decision denying Williams DIB and SSI.  (*Id.*)  Additionally, the Commissioner contends that the ALJ applied the correct legal standard in reaching his decision.  (*Id.*)

**C.  The Administrative Record**

Williams was born on April 12, 1955.  (R. at 97.)  She injured her right wrist on August 10, 2009, after a workplace accident where she slipped and fell.  (R. at 98.)  She had surgery on that wrist on November 12, 2010.  (R. at 113.)

1. **Medical Records**

   a. **Bronx Lebanon Hospital Center (August 2009 – May 2011)**

Following her accident on August 10, 2009, Williams went to Bronx Lebanon Hospital Center ("Bronx Lebanon"), where she complained of right-wrist pain. (R. at 518-22.) An x-ray showed a possible fracture of the wrist. (R. at 523.) Doctors prescribed Motrin and Diovan for pain. (R. at 521.)

On August 24, Williams saw Dr. Sepideh Baghian, who specializes in orthopedic hand surgery. (R. at 523.) She complained of pain in her right wrist, but said there was no numbness or tingling. (*Id.*) Dr. Baghian's evaluation showed that Williams was neurologically intact, but had some tenderness over the ulnar side of her wrist. (*Id.*) Dr. Baghian diagnosed Williams with a right-wrist contusion and placed her in a short-arm cast. (*Id.*)

On October 8, Williams saw Dr. Peter Lesniewski, an orthopedic doctor, to remove her cast. (R. at 524.) Williams was neurologically intact and had a good range of motion, but continued to have some tenderness over her right wrist. (*Id.*) MRI results were negative for distal radial joint injuries and a triangular fibrocartilage complex tear.[1] (*Id.*) Dr. Lesniewski recommended that Williams attend physical therapy and wear a wrist splint during the day for support. (*Id.*)

On November 10, Williams saw Dr. Baghian for a follow-up appointment. She reported that her pain and symptoms had subsided significantly, but she complained of some pain and limitations in the range of motion of her right wrist. (R. at 526.) Dr. Baghian's evaluation revealed that Williams was neurologically intact, her grip strength was four out of five, and the

---

[1] "The triangular fibrocartilage complex (TFCC) is a cartilage structure located on the small finger side of the wrist that cushions and supports the small carpal bones in the wrist. The TFCC keeps the forearm bones (radius and ulna) stable when the hand grasps or the forearm rotates. An injury or tear to the TFCC can cause chronic wrist pain." RUSHORTHO, http://www.rushortho.com/triangular-fibrocartilage-complex-tear.cfm (last visited Dec. 12, 2014).

suspected ulnar fracture had healed. (*Id.*) Dr. Baghian referred Williams to six weeks of occupational therapy so that she could return to work. (*Id.*)

Williams saw Dr. Baghian again on December 10. (R. at 527-28.) A progress note indicated that Williams had begun occupational therapy on November 10. (R. at 527.) Dr. Baghian noted that Williams had to complete a minimum of six weeks of occupational therapy before being cleared to return to work. (*Id.*)

On December 22, Williams complained to Dr. Baghian that she had developed numbness and tingling in her right hand, especially at night. (R. at 528-30.) Although x-rays showed no abnormalities, Dr. Baghian gave her an injection of kenalog[2] and lidocaine[3] in her right wrist. (R. at 528.) She also prescribed anti-inflammatory medication and instructed Williams to wear a thumb splint. (R. at 530.)

On February 2, 2010, Williams complained to Dr. Baghian about occasional pain, but reported significant improvement following the injection and medication prescribed at her last visit. (R. at 531-32.) She had stopped going to occupational therapy before completing the prescribed six weeks because therapy initially exacerbated her symptoms. (*Id.*) Dr. Baghian noted that Williams's symptoms had significantly decreased in intensity and that Williams was wearing her thumb splint as directed. (*Id.*) She advised Williams to return to occupational therapy. (*Id.*)

On April 15, Williams returned to Bronx Lebanon to request another referral for occupational therapy because she had completed six weeks of the recommended program. (R. at

---

[2] Doctors use Kenalog to treat inflammation. DRUGS.COM, http://www.drugs.com/kenalog.html (last visited Nov. 14, 2014).

[3] Lidocaine is an anesthetic that doctors use to numb patients having surgical procedures. MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/lidocaine-topical-application-route/description/drg-20072776 (last visited Nov. 14, 2014).

533.) On April 26, she told Dr. Baghian that she had returned to occupational therapy, and Dr. Baghian noted that she appeared to be making progress. (R. at 534.)

On June 10, Williams told Dr. Baghian that the occupational therapy had resulted in improvement and she was ready to return to work. (R. at 536.) Dr. Baghian noted that there was minimal tenderness over Williams's right wrist near the base of her thumb, and some grip strength weakness, but that she was neurologically intact. (*Id.*) Dr. Baghian asked Williams to obtain a note from her occupational therapist so that he could clear her to return to work, but there is no record that she was ever cleared to return to work. (*Id.*) In a progress note dated August 19, Dr. Baghian reported that Williams needed to continue therapy in order to return to her pre-injury level of activity, and provided Williams with another referral for occupational therapy. (R. at 435.)

On September 27, Williams complained to Dr. Baghian that she had pain in her right wrist, and requested surgery. (R. at 537-38.) Dr. Baghian reported that he would schedule surgery to relieve the pressure on the tendons. (*Id.*)

On November 8, Williams saw Dr. Eric Rosier at Bronx Lebanon Orthopedic Clinic for a preoperative medical evaluation. (R. at 539-41.) On November 10, Dr. Rosier cleared Williams for surgery. (R. at 542-44.) On November 12, Williams had an incision of the tendon sheath to relieve pressure surrounding the tendons on the thumb side of her wrist. (R. at 544-45.) There were no complications from the surgery. (*Id.*)

Williams saw Dr. Joshua Auerbach, an orthopedic doctor, on December 6, because of pain in the base of her neck. (R. at 547-48.) An MRI of Williams's spine showed broad-based disc herniation and disc bulges.[4] (*Id.*) Dr. Auerbach noted that there was no sign of significant

---

[4] "A herniated disc refers to a problem with one of the rubbery cushions (disks) between the individual bones (vertebrae) that stack up to make your spine...a herniated disc can irritate nearby nerves and result in pain,

5

spinal canal stenosis. (*Id.*) He recommended physical therapy and prescribed anti-inflammatory medications. (*Id.*)

Williams saw Dr. Auerbach again on April 18, 2011, and complained of neck pain going down towards her left arm. (R. at 569.) She indicated that her symptoms had not improved despite therapy and pain medication. (*Id.*) Dr. Auerbach diagnosed possible cervical radiculopathy[5] with multiple disc herniations. (R. at 569.) For Williams's neck pain symptoms, Dr. Auerbach recommended a cervical epidural steroid injection, which he administered on May 11. (R. at 571-72.)

### b. Community Medical Care New York (August 2009 – March 2011)

On August 10, 2009, Dr. Ahmed Riaz, a primary care physician, treated Williams at Community Medical Care New York ("Community Medical") for pain in her right-wrist. (R. at 24.) Williams was alert and oriented. (*Id.*) An x-ray of Williams's right wrist revealed a possible fracture of the right ulnar with soft tissue swelling. (*Id.*)

On September 24, Williams complained to Dr. Riaz about numbness, tingling, and constant pain. (R. at 24.) Dr. Riaz reported that Williams could not return to work because she had fractured her right wrist. (*Id.*) He recommended that she take Tylenol or Aleve for the pain. (*Id.*)

On November 23, Williams complained to Dr. Riaz of right-wrist pain and rated her pain as five out of ten, with ten being the worst. (R. at 508.) Dr. Riaz diagnosed a right-wrist sprain and recommended that Williams take Tylenol. (R. at 508-13.) On December 21, Williams

---

numbness or weakness…" MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/herniated-disk/basics/definition/con-20029957 (last visited Dec. 12, 2014).

[5] "Cervical radiculopathy is the clinical description of pain and neurological symptoms resulting from any type of condition that irritates a nerve in the cervical spine (neck)." SPINE-HEALTH, http://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy (last visited Dec. 12, 2014).

indicated that her pain continued, but then rated it as six out of ten. (R. at 501-05.) Dr. Riaz recommended that Williams take Aleve. (R. at 500-05.)

Williams reported reduced pain ratings of three out of ten on January 29, 2010, and four out of ten on April 6. (R. at 480, 493.) On April 19, an unsigned progress note indicated that an electrodiagnostic study revealed no evidence of neuropathy or radiculopathy. (R. at 445.) The examining physician recommended continued conservative management of Williams's symptoms. (*Id.*)

On May 11, Williams rated her pain as five out of ten. (R. at 486.) On July 19, she told Dr. Riaz that her symptoms had decreased. (R. at 474-79.) Williams continued to attend monthly appointments at Community Medical from December 2010 through April 2011. (R. at 438-73.) Progress notes did not indicate any significant change in symptoms. (*Id.*)

### c.  Dr. Albert Graziosa (October 2009)

Williams had an initial orthopedic consultation with Dr. Albert Graziosa, an orthopedic doctor, on October 8, 2009. (R. at 432.) She complained of right-wrist pain. (*Id.*) Dr. Graziosa's examination revealed that Williams's finger dexterity and sensations were intact and there were no bony abnormalities. (R. at 433.) Williams, however, had limited range of motion when moving her wrist from one side to the other, and bending her wrist forward and backward. (*Id.*) Dr. Graziosa diagnosed right-wrist contusion with joint effusion. (*Id.*) He recommended that Williams continue to wear the wrist splint and attend occupational therapy for her right hand. (R. at 434.)

### d.  Dr. Howard Tedoff (September 2010)

The New York State Office of Temporary Disability Assistance referred Williams to Dr. Howard Tedoff for a psychological evaluation. On September 16, 2010, Dr. Tedoff examined

Williams and reported that she was able to perform daily living activities, including grooming,

hygiene, maintaining her household, managing finances, and using transportation independently.

(R. at 393.)  Williams could follow and understand complex instructions, maintain attention and

concentration, and complete relatively complex tasks independently.  (R. at 395.)  She could

relate well to others and deal appropriately with stress.  (*Id.*)  Dr. Tedoff observed that Williams

was depressed, but that her memory was intact.  (R. at 394.)  He found that the results of the

examination were not consistent with psychiatric problems that would significantly interfere with

Williams's ability to function on a daily basis.  (*Id.*)  He concluded that Williams's problems

were physical and diagnosed depressive disorder secondary to physical pain.  (*Id.*)

### e.  Dr. William Lathan (September 2010)

Dr. William Lathan, a medical internist from Industrial Medicine Associates, P.C.,

performed a consultative medical examination of Williams on September 28, 2010.  (R. at 397.)

He reported that Williams could perform all personal and daily living activities.  (*Id.*)  He

observed that Williams was not in acute distress, had a normal gait and stand, could squat fully,

and could change her clothes without help.  (R. at 398.)  He noted that Williams had no trouble

getting on or off the examination table.  (*Id.*)  Dr. Lathan reported that Williams did not use

assistive devises, and could walk on heels and toes without difficulty.  (*Id.*)  In addition,

Williams had intact finger dexterity, full grip strength, and full range of motion of shoulders,

elbows, forearms, wrists, hips, knees, and ankles bilaterally.  (R. at 398-99.)  Her cervical spine

had full flexion, extension, lateral flexion, and full rotary movements.  (R. at 398.)  Dr. Lathan

noted no sensory deficits.  (R. at 399.)  He diagnosed Williams with a history of right-wrist

tendinitis and a history of hypertension.  (*Id.*)  He concluded that Williams has a "moderate

restriction for lifting, pushing, pulling with right upper extremity," and indicated her diagnosis was stable. (*Id.*)

### f.   Dr. Jose Corvalan (August 2011)

The Division of Disability Determination referred Williams to Dr. Jose Corvalan, an orthopedic doctor, so Williams could obtain an orthopedic consultative report. (R. at 422.) Dr. Corvalan examined Williams on August 12, 2011. (*Id.*) He observed that Williams was not in acute distress, had a normal gait and stand, could squat fully, and needed no help changing clothes or getting on or off the table. (R. at 423.) He reported that Williams did not use assistive devices, and observed that Williams could walk on both heels and toes without difficulty. (R. at 424.) Williams had intact finger dexterity, full grip strength, and full range of motion of shoulders, elbows, and forearms, with some tenderness on the wrists. (*Id.*) Williams was able to bend forward thirty degrees at the waist (flexion and extension), rotate forty degrees at the waist on both sides (bilateral rotation), and bend sideways at the waist thirty degrees on both sides (bilateral flexion). (*Id.*) Williams had no joint inflammation, effusion, or instability. (*Id.*) There was also no muscle atrophy and no sensory abnormality. (*Id.*) Dr. Corvalan diagnosed Williams with upper-back pain, right-wrist pain, left-ankle pain, high blood pressure, thyroid disease, acid reflux, and hemorrhoids. (R. at 425.) He concluded that Williams had moderate limitations lifting heavy objects because of back pain, and moderate limitations moving her neck and walking. (*Id.*) He recorded Williams's prognosis as stable. (*Id.*)

### g.   Dr. Gerry Galst (March 2012)

Dr. Gerry Galst, an impartial medical expert, testified at the ALJ hearing. (R. at 52-73.) He assessed Williams's condition based on her medical records. (*Id.*) He noted that Williams's physician, Dr. Baghian, diagnosed possible carpal tunnel syndrome. (R. at 53.) Dr. Galst

testified that the medical evidence of record did not support this diagnosis because Williams's

electrodiagnostic studies were negative for carpal tunnel syndrome. (R. at 58.) He stated that

Williams might have some limitations in repetitive lifting and reaching with her right arm above

her head, but that she should be able to lift up to twenty pounds occasionally. (R. at 59, 64.) He

also found that fingering and handling with her right hand would be problematic, and that she

might have some trouble writing and would be limited in writing up to one third of the time. (R.

at 59, 64.) Based on her medical records, Dr. Galst did not believe that Williams's medical

conditions indicated any degree of disability, and that she should be able to perform light work.

(R. at 52, 58.)

### 2. Non-Medical Evidence

Williams testified before the ALJ at her November 2011 and March 2012 hearings. (R.

at 36-166.) She explained that her position at Madison Security Group required her to write

incident reports, perform perimeter checks throughout the building, and walk down stairwells.

(R. at 98-101.) She testified that her job required a lot of writing, but did not require lifting. (R.

at 99.) She spent most of the day walking. (R. at 100.) Prior to working for Madison Security

Group, Williams was a counselor for disabled children and an inventory clerk. (R. at 106.)

Williams testified that she was right-handed, and stopped working because she fell at her

security job and injured her right hand. (R. at 38-39.) She indicated that she had a throbbing

pain in her right hand that went up her wrist. (R. at 41.) When doing laundry, washing dishes,

mopping floors, or performing other daily living activities, her pain worsened. (R. at 42, 48.)

Williams explained that she had difficulty writing because her hand would "stick." (R. at 114.)

She was unable to write more than her name and address because of the pain in her right wrist.

(R. at 49.) Williams took pain medications regularly, but physical therapy and medication did

not help her right-wrist pain. (R. at 124, 129.) Although she had right-hand surgery, her

condition did not improve. (R. at 45.) She testified that she had carpal tunnel syndrome. (R. at

110.)

### 3. ALJ Decision

On July 7, 2010, the ALJ issued an opinion denying Williams's request for DIB and SSI.

(R. at 20.) He found that: (1) Williams met the insured status requirements of the Social Security

Act through June 30, 2010; (2) Williams had not engaged in substantial gainful activity since

August 10, 2009, the alleged onset date; (3) Williams had severe impairments (right-wrist

fracture, hypertension, and cervical discogenic disease[6]); (4) Williams did not have an

impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d),

404.1525, 404.1526, 416.920(d), 416.925 and 416.926); (5) Williams had the residual functional

capacity to perform light-type work activities as defined in 20 CFR §§ 404.1567(b) and

416.967(b); (6) Williams was capable of performing past relevant work as a security guard and

this work did not require the performance of work-related activities precluded by Williams's

residual functional capacity (20 CFR §§ 404.1565 and 416.965); and (7) Williams was not

disabled, as defined in the Social Security Act, from August 10, 2009, through the date of his

decision (20 CFR §§ 404.1520(f) and 416.920(f)). (R. at 22-29.)

### 4. Appeals Council Review

The Appeals Council denied Williams's request for review of the ALJ's decision and the

ALJ's decision became the final decision of the Commissioner. (R. at 1-5.)

---

[6] "Cervical discogenic disease occurs when the discs between the vertebrae in the neck region wear down, bulge, or become herniated." LASERSPINEINSTITUTE, www.laserspineinstitute.com/back_problems/spinal_anatomy/cervical/ (last visited Dec. 12, 2014).

### III. SCOPE OF JUDICIAL REVIEW UNDER 42 U.S.C. § 405(g)

A court reviewing a denial of Social Security benefits does not assess the issue of a claimant's eligibility *de novo*. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to determining first whether the Commissioner applied the correct legal principles in reaching a decision and, if so, whether substantial evidence supports the decision. 42 U.S.C. § 405(g); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Donato v. Secretary of Health and Human Service*, 721 F.2d 414, 418 (2d Cir. 1983).

The Social Security Act ("the Act") provides that the Commissioner's findings, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 387, 401 (1971); *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a scintilla." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard applies to findings of fact as well as inferences and conclusions drawn from such facts. *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966); *Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994).

If the court finds that the Commissioner applied the correct legal standard and substantial evidence supports the Commissioner's determination, the court must uphold the Commissioner's decision. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 401; *Donato*, 721 F.2d at 418. The court must uphold a denial of benefits supported by substantial evidence even in cases where there is substantial evidence supporting the plaintiff's position, *Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990), or where a reviewing court's independent analysis of the evidence would differ from the Commissioner's. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV. STANDARD GOVERNING EVALUATIONS OF DISABILITY CLAIMS

The Act's definition of disability for the purposes of DIB and SSI is substantially the same. *Henderson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980). For a court to consider an individual disabled, she must have a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of no less than twelve months and, as a result, be unable to engage in any substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant is not considered disabled if she is able to engage either in her previous work, or any other substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c (a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the Regulations—if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the residual functional capacity ("RFC") to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to

prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

In making a determination of disability, the Commissioner may consider objective medical facts and diagnoses, medical opinions, subjective evidence of disability by plaintiff, and plaintiff's background. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Moreover, the expert opinion of the treating physician is entitled to particular weight. *Id.*

## V. ANALYSIS

Williams seeks reversal of the ALJ's determination on three grounds: (1) that the ALJ improperly evaluated Williams's residual functional capacity (RFC); (2) that the ALJ improperly evaluated Williams's credibility; and (3) that the ALJ improperly evaluated Williams's ability to perform past relevant work. (Pl. Mem. at 6-13.) The Court concludes that the ALJ's RFC finding is the product of legal error because the ALJ failed to reconcile his RFC determination with an opinion of Williams's doctor, which he otherwise afforded great weight. Additionally, the Court finds that substantial evidence supports that the ALJ's assessment of Williams's credibility. Finally, substantial evidence does not support the ALJ's finding that Williams is capable of performing past relevant work because inaccurate information influenced the ALJ's finding. For the reasons set forth below, the Court remands this case for further proceedings.

### A. The ALJ's RFC Finding

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996, WL 374184, *2 (July 2, 1996)). When assessing a claimant's RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of

14

symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §

404.1545(b-e)), *aff'd*, 370 Fed.Appx. 231 (2d Cir. 2010).

The ALJ is not required to accept any single medical opinion as dispositive on the

determination of disability. *See Francois v. Astrue*, No. 09-CV-6625, 2010 U.S. Dist. LEXIS

61456, at *17-18 (S.D.N.Y. June 18, 2010) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106

(2d Cir. 2008)). Rather, the ALJ is entitled to weigh the evidence and resolve genuine conflicts

in the medical evidence. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing

*Richardson*, 402 U.S. at 399). The ALJ, however, may not "arbitrarily substitute his own

judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

If the ALJ's RFC finding conflicts with an opinion from a medical source, the ALJ "must

explain why the opinion was not adopted." (Soc. Sec. Ruling 96-8p (1996).) Although the ALJ

is not required to "explicitly reconcile every conflicting shred of evidence in the record," an ALJ

"cannot simply selectively choose evidence in the record that supports [his] conclusions."

*Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (quoting *Fiorello*

*v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)); *see also Cabassa v. Astrue*, No. 11-CV-1449

(KAM), 2012 WL 2202951, at *7 (E.D.N.Y. June 13, 2012) ("An ALJ's failure to reconcile

materially divergent RFC opinions of medical sources is also ground for remand").

Here, the ALJ concluded that Williams retained the RFC to perform light work activities.

(R. at 23.) The ALJ found:

> [T]he claimant cannot do heavy lifting or carrying. She can lift and carry 20 pounds
> occasionally and 10 pounds frequently, sit, stand/walk up to 6 hours in an 8-hour
> day. The claimant can do occasional fingering and handling and write reports with
> the right arm. There were no limitations for the left hand.

(*Id.*) The ALJ stated that the opinions of Williams's doctors, Dr. Corvalan and Dr. Lathan,

support his RFC finding. (R. at 28.) The ALJ assigned great weight to their opinions because

the opinions were "consistent with each other and supported by the weight of the record evidence." (R. at 28.)

Williams argues that the ALJ's RFC finding is erroneous because the ALJ failed to reconcile his finding with Dr. Corvalan's opinion regarding her neck limitations. (*See* Pl. Mem. at 8.) Dr. Corvalan concluded that Williams has "moderate limitations on flexing and extending her neck or moving the neck to the lateral position on the left side. She also has difficulty lifting. She has moderate limitations on lifting heavy objects because of pain in the upper back. She also has limitation lifting anything heavy with the right hand because of the right wrist pain." (R. at 425.) The ALJ adopted Dr. Corvalan's statements regarding lifting restrictions, but excluded the neck limitations. (R. at 23-28.) A neck restriction could affect an RFC finding because Williams testified that her work as a security officer involved some physical activity, including securing the premises. (R. at 98-101.) Although the ALJ's decision noted Dr. Corvalan's conclusion regarding Williams's neck limitations, and purported to give all of Dr. Corvalan's opinions great weight, the ALJ did not explain why he ignored the neck restriction in his analysis. (R. at 26.) In failing to offer such an explanation, the ALJ created a discrepancy between his RFC assessment and Dr. Corvalan's medical source statement.

Williams also argues that the ALJ failed to reconcile his RFC finding with Dr. Lathan's opinion regarding her restrictions for pushing and pulling with the right arm. (*See* Pl. Mem. at 6.) Dr. Lathan concluded that Williams has a "moderate restriction for lifting, pushing, pulling with right upper extremity." (R. at 398.) The ALJ adopted only the portion of Dr. Lathan's statement that restricts Williams from lifting heaving objects. (R. at 23.) He disregarded Dr. Lathan's statement pertaining to Williams's ability to push and pull, and did so without explanation. (R. at 23-28.) Williams argues that in failing to provide an explanation for the

omission, the ALJ created another discrepancy between his RFC assessment and the opinion of a medical source.

Williams, however, does not explain how the limitation in pushing and pulling would affect her ability to perform her duties as a security officer. Williams's testimony makes no references or inferences to pushing and pulling when describing her security officer duties. (R. at 99-102.) Thus, Williams does not show why the ALJ's failure to discuss her restrictions in this area is pertinent to the ALJ's RFC assessment.

Nevertheless, the Court finds that remand is appropriate because the ALJ failed to explain his selective adoption of Dr. Corvalan's statements when he omitted Williams's neck limitations. On remand, the Court requires the ALJ to reconcile his RFC determination with the complete opinion of Dr. Corvalan, or state with sufficient particularity why he did not adopt Dr. Corvalan's opinion.

## B. Williams's Credibility

### 1. Whether the ALJ applied the correct legal standard

The Social Security Administration ("SSA") has issued a regulation relating to reports of pain or other symptoms by a claimant for SSI benefits. (*See* 20 C.F.R. § 416.929(c).) This regulation provides, *inter alia*, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . . solely because the available objective medical evidence does not substantiate [her] statements." (20 C.F.R. § 416.929(c)(2).) The regulation also provides that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [her] statements and the rest of the evidence." (20 C.F.R. § 416.929(c)(4).) Moreover, if the ALJ rejects witness testimony as not credible, the

basis for the finding must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1983)); *accord Snell*, 177 F.3d at 135. The ALJ must make this determination "in light of the medical findings and other evidence regarding the true extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984).

In this case, the ALJ found Williams's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible to the extent that they were inconsistent with the conclusions reached as to Williams's RFC. (R. at 28.) The ALJ stated:

> [Williams's] complaints, symptoms and statements concerning her impairments and their impact on her ability to work are not entirely credible based on the evidence of the record. The claimant complained of some of these symptoms, but these symptoms are not indicative of a serious condition that would limit claimant's activities significantly.

(R. at 27.) The ALJ cited two inconsistencies to support his credibility finding: (1) There was no evidence of any "serious muscular weakness or sensory loss, which is usually present in cases of severe and continuous pain" and (2) Williams's alleged limitations of her "inability to sit, stand, lift, carry, walk, push and pull" were not entirely credible based on the evidence of record. (*Id.*)

Williams submits that the ALJ's conclusions were erroneous. First, Williams argues that the ALJ erred in concluding that Williams's pain is not of such frequency, intensity, or duration as to be disabling. (*See* Pl. Mem. at 8.) Williams contends that this finding constituted an improper substitution by the ALJ of his own lay opinion in place of medical testimony. (*Id.*) The Court disagrees. The ALJ credited the testimony of "two separate independent examiners" who did "not find any neurological or musculoskeletal abnormalities in her hand." (R. at 135.) Thus, the ALJ's finding did not constitute an improper substitution of his own judgment because he based his finding on the medical opinions of Williams's doctors. *See Matta v. Astrue*, 508 F.

App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

Williams also argues that the ALJ's credibility finding was erroneous because the ALJ did not set forth the basis for his credibility findings with sufficient specificity to enable this Court to properly review those findings. (*See* Pl. Mem. at 9.) Specifically, Williams challenges the ALJ's statement that she "complained of some of these symptoms, but these symptoms are not indicative of a serious condition that would limit [Williams's] activities significantly." (*Id.*)

The ALJ's decision, however, does cite several reasons for discrediting Williams. First, the ALJ notes that the "record reflects that the pain is not constant" because after her wrist surgery, the record reflects that "her condition improved and she complained of occasional pain." (R. at 27.) Second, the ALJ writes, "[I]t was alleged that the claimant had carpal tunnel syndrome, but this diagnosis is not substantiated by the evidence of record. She did not have surgery for this condition." (*Id.*) Third, the ALJ notes that Williams complained of cervical pain, but the record showed no evidence of cervical radiculopathy, muscle atrophy, or sensory abnormality. (*Id.*) By citing these inconsistencies, the ALJ provides a sufficient basis for discrediting Williams's testimony. *See Williams*, 859 F.2d 255, 260-61.

### 2. Whether substantial evidence supports the ALJ's credibility finding

Although Williams testified that her pain was constant, progress notes dated February and April 2010 indicated that she only complained of occasional pain. (R. at 29.) Williams testified that surgery did not improve her right-hand condition, but progress reports indicated that "her symptoms significantly decreased after an injection to the first dorsal compartment and therapy." (R. at 20.) The record also shows that while Williams testified that she had carpal

tunnel syndrome and she had surgery for this condition, the electrodiagnostic studies show that

Williams tested negative for carpal tunnel syndrome, and there is no evidence in the record to

show that Williams ever had surgery for carpal tunnel syndrome.  (R. at 110, 158.)

Finally, the record shows that Williams complained of cervical pain, but the progress

notes indicate that there was no evidence of neuropathy or radiculopathy.  (R. at 445.)

Additionally, Williams received a cervical epidural steroid injection to quell her neck pain

symptoms.  (*Id.*)  Thus, while she reported certain physical problems and accompanying

complaints of pain, there is substantial evidence in the record to support the ALJ's finding that

the intensity and severity of pain complained of was not credible based on the record as a whole.

Therefore, I find that the ALJ did not err in finding that Williams was not credible to the

extent she alleged the severity of her disabilities.

## C.  Williams's Past Relevant Work

In the fourth step of the SSI inquiry, the claimant has the burden of showing an inability

to return to her previous specific job and an inability to perform her past relevant work generally.

*See Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981); *see also* SSR 82-62, 1982 WL 31386, at *3

(Past relevant work in the fourth stage of the inquiry includes "the specific job a claimant

performed or the same kind or work as it is customarily performed throughout the economy.").

The ALJ must compare his assessment of the claimant's RFC with the physical and mental

demands of the claimant's past relevant work.  (20 C.F.R. § 404.1566(b).)

The ALJ may call upon a vocational expert to obtain evidence needed to determine

whether the claimant can still perform her past relevant work.  (20 C.F.R. § 404.1566(b)(2).)

Additionally, "a vocational expert also may offer expert opinion testimony in response to

hypothetical questions about whether a person with the physical and mental limitation's imposed

by the claimant's medical impairments can meet the demands of her previous work." *MacAuliffe v. Barnhart*, 571 F. Supp. 2d 400, 405 (W.D.N.Y. 2008). The vocational expert's testimony "is only useful if it addresses whether the particular claimant, with his limitations and capabilities can realistically perform a particular job." *Aubeud v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).

Here, the ALJ found that Williams is capable of performing past relevant work as a security guard because this work does not require performance of work-related activities precluded by her RFC. (R. at 28.) The ALJ explained that he based his finding on the vocational expert's testimony that Williams could perform her prior job as a security guard. (*Id.*)

Williams argues that the ALJ erred in determining that she is capable of performing her past relevant work as required by the job. (*See* Pl. Mem. at 9) She maintains that her RFC restricts her from performing her previous specific job because the job required frequent writing, including writing incident reports and logging in and out. (R. at 115.)

The ALJ called upon a vocational expert to determine whether Williams was capable of performing her previous specific job. (R. at 82.) At the March 2012 hearing, he asked the expert whether a hypothetical individual of Williams's age, education, work experience, and limitations could go back and do Williams's job as she described performing the job. (*Id.*) The expert testified that she would "be able to return if fingering is occasional." (*Id.*) The expert further noted that as Williams described performing the job, writing, fingering, and handling would not be limited to occasional use with the dominant hand because Williams's previous specific job may require more writing and paperwork when performed in a government residential setting. (R. at 86.) The expert offered no evidence to show that Williams could perform her previous specific job without frequent fingering and handling. Thus, substantial evidence does not

support the ALJ's finding that Williams could perform past relevant work as she performed it because it is inconsistent with both Williams's testimony and the expert's testimony.

Next, Williams notes that, while the ALJ cited the correct code for a community service officer in his decision, the ALJ stated without explanation that Williams was capable of performing past work as a "security guard." (R. at 28.) Williams argues that the ALJ erred in determining that she is capable of performing her past relevant work as it is generally performed, even if the job in question were a community service officer. (*See* Pl. Mem. at 9-11.) In either case, Williams could not perform the job. The Dictionary of Occupational Titles ("DOT") lists community service officer as frequent for fingering and handling and occasional for a security guard. (R. at 85.) Williams's RFC precludes frequent fingering and handling. (R. at 23.) It is unclear from the ALJ's decision whether the ALJ relied on the expert's testimony with respect to the community service officer job or the security guard job. (R. at 28.) A review of the March 2012 hearing does not clarify the matter because the ALJ and expert used security guard and community service officer interchangeably throughout the hearing. (R. at 79-89.)

At the supplemental hearing on March 2012, the vocational expert testified that Williams's past relevant work included a community service officer. (R. at 80.) The ALJ asked the vocational expert whether a person of Williams's age, education, work experience, and limitations could go back and do the job of a security guard. (R. at 83-84.) The expert answered yes. (R. at 84.) He later testified, however, that he listed Williams's past relevant work as a community service officer and not as a security guard. (R. at 85.) The vocational expert also noted that a community service officer requires frequent fingering and handling, and that Williams's RFC restricted her from performing frequent fingering and handling with her right hand. (R. at 85.)

While the hypotheticals posed by the ALJ accurately reflected Williams's limitations, the

ALJ's hypotheticals did not include the correct classification for past relevant work as a

community service officer. (R. at 83-85.) As a result, the hypothetical questions asked at the

hearing did not address whether Williams could realistically perform her past relevant work as a

community service officer. Despite the ALJ's recognition of the expert's mistake at the hearing,

the ALJ failed to resolve the inconsistencies in the expert's testimony or further develop the

record with respect to Williams's ability to perform past relevant work as a community service

officer. Therefore, substantial evidence does not support the ALJ's decision denying Williams's

disability benefits because the ALJ's finding that Williams could perform past relevant work as it

is generally performed was predicated on incomplete information. This was not a harmless error

because a literal reading of the DOT precludes Williams from meeting the demands of her

previous work.

On remand, the ALJ must pose accurate hypothetical examples to the vocational expert

and make sure that he and the vocational expert are talking about the same job at the same time.

Additionally, the ALJ should take greater care to ensure that his decision accurately reflects

Williams's past relevant work as a community service officer. For these reasons, I find that

substantial evidence does not support the ALJ's finding that Williams is able to perform past

relevant work as a community service officer.

### VI. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Williams's motion for judgment

on the pleadings and **REMANDS** this case to the Commissioner for reconsideration in

accordance with this Order and Opinion. On remand, the ALJ must reconcile his RFC finding

with the opinions of Dr. Corvalan, or state with sufficient particularity why he omitted the

consultative examiner's opinions.  Additionally, the ALJ failed to elicit reliable testimony from the vocational expert.  Thus, the ALJ must resolve the inconsistencies in the record to determine whether Williams can perform past relevant work as a community service officer is generally performed.


**SO ORDERED this 17th day of March 2015**
**New York, New York**


The Honorable Ronald L. Ellis
United States Magistrate Judge